UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LATONIA DIXON,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>CAROLYN W COLVIN,<br><br>　　　　Defendant. | Case No.  15-cv-00917-DMR<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 16, 19 |

　　　　Plaintiff Latonia Dixon moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner") final administrative decision, which found Plaintiff not disabled and therefore denied her application for benefits under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*  Plaintiff's Motion for Summary Judgment ("Pl.'s MSJ") [Docket No. 16].  The Commissioner cross-moves to affirm.   Defendant's Motion for Summary Judgment ("Def.'s MSJ") [Docket No. 19].  For the reasons stated below, the court grants Plaintiff's motion; denies the Commissioner's motion; and remands the action for further proceedings.

## I.　　PROCEDURAL HISTORY

　　　　Plaintiff filed an application for Social Security Disability Insurance (SSDI) benefits on August 9, 2011, alleging a disability onset date of March 1, 2010.  Administrative Record ("AR") 128-37.  Her application was initially denied on October 21, 2011 and again on reconsideration on May 3, 2012.  AR 128-37, 138-149.  Following the denial on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 165.  Plaintiff appeared and testified at a hearing before ALJ Jennifer M. Horne on August 27, 2013.  AR 64.

　　　　After the hearing, the ALJ issued a decision finding Plaintiff not disabled.  AR 26-56.  The

ALJ determined that Plaintiff has the following severe impairments: thyroid cancer; status post bilateral thyroidectomy; status post crust injury bilateral wrists; osteopenia; obesity; posttraumatic stress disorder ("PTSD"); and major depressive disorder.  AR 31.  She also concluded that Plaintiff's ankle strain; complaint of vertigo; right shoulder and elbow injury; and migraine headaches were non-severe.  AR 31-32.  The ALJ found that Plaintiff retains the following residual functional capacity ("RFC") to perform light work:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR [§] 404.1567(b) with the following modifications: can lift and carry a maximum of 10 pounds; sit for six hours in an eight hour day; stand and/or walk for six hours in an eight hour day; can perform simple routine repetitive unskilled work; no public contact; and occasional contact with coworkers as well as supervisors.

AR 34.  Relying on the opinion of a vocational expert ("VE") who testified that an individual with such an RFC could perform jobs existing in the economy, the ALJ concluded that Plaintiff is not disabled.  AR 50.

The Appeals Council denied Plaintiff's request for review on December 31, 2014.  AR 6-11.  The ALJ's decision therefore became the Commissioner's final decision.  *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011).  Plaintiff then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.    THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[1]  and that is expected to result in death or to last for a continuous period of at least twelve months.  *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)).  The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.  *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20

---

[1] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C.F.R. §§ 404.1510, 416.910.

United States District Court
Northern District of California

C.F.R. §§ 404.1520, 416.920.  The steps are as follows:

    1.    At the first step, the ALJ considers the claimant's work activity, if any.  If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

    2.    At the second step, the ALJ considers the medical severity of the claimant's impairment(s).  If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

    3.    At the third step, the ALJ also considers the medical severity of the claimant's impairment(s).  If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

    4.    At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

    5.    At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work.  If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

    20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

## III.    FACTUAL BACKGROUND

### A.    Plaintiff's Testimony and Relevant Evidence from the Record

    The record contains the following information.  Plaintiff was born in 1963.  AR 128.  She lives by herself in an apartment.  AR 92.  Plaintiff served in the Army from August 17, 1982 to March 15, 1989 and was diagnosed with a mental condition during military service.  AR 305-06.  During service, Plaintiff experienced sexual assault, sexual harassment, and spousal abuse.  AR 306.  From 1993 to November 2010, Plaintiff worked as a registered nurse ("RN").  AR 70-71,

United States District Court
Northern District of California

3

United States District Court
Northern District of California

1   269.  She worked full-time from 1993 until 1995, and approximately twenty-four hours a week

2   thereafter.  AR 98-99.   Plaintiff worked as an adjunct professor at Napa Valley Community

3   College from February 2006 to December 2007 where she taught American Mind, Comparative

4   Religion, Philosophy of Religion and Ethics.  AR 70-71, 269.

5        In 2010, Plaintiff's ex-boyfriend assaulted her, attempted to rape her, and injured the

6   nerves in her arms.   AR 69, 73.  Plaintiff took a leave of absence from work from March 2010 to

7   September 2010.  AR 73.  In September 2010, Plaintiff returned to work but stopped working in

8   November 2010 when she "lost it . . . [and] started crying" while teaching a class and felt like she

9   was going to "lose [her] mind" while dispensing flu shots.  AR 74.  Plaintiff testified that her

10  manager tried to work with her, but she couldn't go back because she was "having flashbacks

11  every day" throughout the day.  AR 74.  Plaintiff testified that she cannot return to nursing

12  because she does not want to lose her license or injure somebody.  AR 104.  In November 2010,

13  Plaintiff was on levothyroxine (thyroid hormone) medication for PTSD, as well as medication for

14  arm pain.  AR 75-76.  After the incident at work, Plaintiff started taking Zoloft, which helped

15  decrease flashbacks.  AR 76.  Her psychiatrist eventually switched her to Effexor, but she had to

16  stop taking it due to stomach pains.  AR 76-78.  At the time of the hearing, Plaintiff testified that

17  she was using homeopathy along with anti-anxiety medication which she took as needed when she

18  was overwhelmed, approximately several times a month.[2]  AR 79, 81.  Plaintiff also attends

19  individual and group therapy two or three times a week.  AR 101.

20       Plaintiff does not have limitations on sitting and standing but becomes short of breath if

21  she walks two blocks.  AR 116.  Plaintiff testified that she is able to lift two to five pounds.  AR

22  117-18.  Plaintiff sometimes has problems using her fingers and if she spends too long working on

23  a keyboard she gets "shooting pain" in her arms.  AR 118.  Plaintiff takes Naproxen twice a week

24  when she is in pain, which helps.  AR 118-19.

25       Plaintiff lives by herself and her nephew cleans the apartment.  AR 92.  She does her own

26

27  _____

[2] Plaintiff submitted a list on the day of the hearing which contained the following medications: 1)
Levothyroxine, 2) Zolmitriptan, 3) Cholecalciferol, 4) Naproxen, and 5) Calcium.  AR 304.  The
28  medical records indicate Plaintiff has been on and off numerous medications.  AR 310-591, 623-
1483.

United States District Court
Northern District of California

laundry, but needs help with shopping and cooking.  AR 93.  Shopping and cooking make Plaintiff feel overwhelmed because she is around a lot of people.  AR 93.  Activities such as cleaning her place or going to the grocery store can also make Plaintiff feel overwhelmed.  AR 80.  Sometimes when Plaintiff is very depressed, she does not eat until five in the evening.  AR 93.  She sometimes does not bathe for up to three days.  AR 94.  On days when Plaintiff has panic attacks or flashbacks, she does nothing other than watch television.  AR 95-96.  She testified that on average, four days of the week were "bad days" during which she would stay at home, look at the television, and call her friends when she started to get very depressed.  AR 103.  Although Plaintiff used to read for school, she is now overwhelmed when trying to read.  AR 97.  In 2010, Plaintiff had numerous flashbacks and thought she was going to kill herself.  AR 81.  She gave her friends her knives, hid her pills, and slept at a friend's house.  AR 81-82.  Plaintiff has a history of previous suicide attempts and had periods of psychiatric hospitalization in 1989 and 1990.  AR 81-82, 336.

The 2010 incident led Plaintiff to meet her friends less often.  AR 102.  Plaintiff testified she cannot do anything without having an anxiety attack or hiding.  AR 102-03.  Plaintiff no longer enjoys activities like being with people that she trusts because it has become overwhelming.  AR 103.

Plaintiff has been able to engage in some activities.  In February 2011, Plaintiff attended a Prince concert by herself.  AR 83.  In 2011 and 2012, Plaintiff traveled to Hawaii, Chicago and Las Vegas because she felt like she needed "to get away from here."  AR 84, 357, 377.  During her trip to Hawaii, Plaintiff stated that she became sick, stayed in her room for the most part, and experienced an anxiety attack on the plane.  AR 84.  When Plaintiff visited a friend in Chicago, she testified that she mostly stayed in her room and put a chair near the hotel room door because she was scared.  AR 84.  She spent a lot of time in her room during her trips to Hawaii and Chicago because she felt unsafe, nervous, and "weird."  AR 85.

Plaintiff organizes veteran art shows and events at the Veterans Community Meeting Center.  AR 83, 89.  For the art shows, Plaintiff sends out flyers made by other people, sends e-mails, and puts up her artwork.  AR 87-88.  Plaintiff is overwhelmed when organizing art shows

and receives a lot of help from other people.  AR 85, 100.    During an art show, Plaintiff felt

overwhelmed by having to be present, read poetry, and talk to people; she cried for two-and-half

hours and called her psychiatrist.  AR 86.  In 2013, Plaintiff was elected as the Commander of the

American Legion Post which required her to attend meetings and hold events at the Veterans

Community Meeting Center.  AR 89.  She helped organize a Take Back the Night event by

sending e-mails and attending the candlelight vigil.  AR 90.  At the time of the hearing, Plaintiff

was planning another Take Back the Night event in the next year.  AR 91.

### B.    Relevant Medical Evidence

#### 1.    Courtney Valdez, Ph.D.

Dr. Courtney Valdez[3], a clinical psychologist, began treating Plaintiff in January 2011 on a

weekly or bi-weekly basis.  AR 108, 311.  On February 24, 2011, Dr. Valdez diagnosed Plaintiff

with PTSD and depressive disorder.  AR 314.

On September 13, 2012, Dr. Valdez completed a mental impairment questionnaire.  AR

617.  Based on 101 individual and group assessments and treatment sessions with Plaintiff, Dr.

Valdez stated that Plaintiff "demonstrates significant impairment due to debilitating symptoms of

PTSD and depression including: suicidal ideation, poor concentration, panic attacks, low energy,

hypervigilance, insomnia and dissociation."  AR 617.  Dr. Valdez opined that Plaintiff was unable

to meet competitive standards or was seriously limited but not precluded in several areas for

unskilled and skilled work.  AR 619-20.  She opined that Plaintiff "demonstrates significant

impairment and inability to concentrate and therefore struggles with remembering, maintaining

attention and punctuality."  AR 619.  She further stated that Plaintiff's PTSD resulted in "insomnia

and frequent intrusive memories which impaired her concentration as well as her ability to manage

everyday stresses."  AR 619.  Dr. Valdez wrote that Plaintiff "decompensates stressed" and "[t]he

nature of the [Plaintiff's] trauma history also impairs her ability to get along with others,

especially when she has experienced a trigger."  AR 619.  Dr. Valdez found that Plaintiff had

unlimited or very good ability to maintain socially appropriate behavior and adhere to basic

---

[3] The ALJ referred to this provider as "Ms. Valdez."  However, the record reflects that Dr. Valdez
holds a Ph.D.

United States District Court
Northern District of California

standards of neatness and cleanliness.  AR 620.  She also stated that Plaintiff had limited but satisfactory ability to interact appropriately with the general public, travel in an unfamiliar place and use public transportation.  AR 620.  Dr. Valdez found Plaintiff had moderate restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; and three episodes of decompensation within a twelve month period, each of at least two weeks duration.  AR 621.  Dr. Valdez anticipated that Plaintiff's impairments or treatment would cause the patient to be absent from work for more than four days per month.  AR 622.

On August 15, 2013 Dr. Valdez completed an updated mental impairment questionnaire.  AR 1489.  Her answers were similar to those from the September 13, 2012 questionnaire, with two notable differences.  AR 1484-89.  Dr. Valdez opined in the 2013 questionnaire that Plaintiff had seriously limited but not precluded ability to accept instructions and respond appropriately to criticism from supervisors, whereas she had previously opined that Plaintiff had a limited but satisfactory ability to do so.  AR 619, 1486.  In 2013, Dr. Valdez noted that Plaintiff experienced one or two episodes of decompensation within a twelve month period, each of at least two weeks duration, as opposed to three episodes in 2012.  AR 621, 1488.

At the hearing before the ALJ on August 27, 2013, Dr. Valdez testified that although Plaintiff has significantly improved, she still struggles with emotional dysregulation difficulties, episodes of disassociation, some suicidal ideation, and occasional panic attacks.  AR 109.  She testified that Plaintiff would not yet be able to withstand the stress from a full-time job.  AR 111.

The ALJ questioned how Dr. Valdez's opinion of Plaintiff's "marked impairment in maintaining concentration, persistence, and pace" was consistent with Plaintiff's ability to organize events and attend treatments.  AR 114.  Dr. Valdez explained the following:

> [I]n the context of a very strong therapeutic [inaudible], which includes regular visits with me, regular visits at the VA Hospital, medication trials, she again, can do these short-term projects and, again, often will struggle coming in and spends hours discussing how difficult it was about a particular interaction with a particular person.  We talk about ways she might be able to cope with that. Sometimes she's able to apply the skills, sometimes she's not.
> With an extraordinary amount of resources directed her way, she can do

small projects that are meaningful and impactful.  Again, thinking about a regular and consistent employment, I, I don't that that translates....I think part of what keeps her successful in these mini projects is because they are consistent with her overall healing and treatment.  It's almost as if those are treatment activities and if we filled up her time with activities that were not consistent with treatment, I, I would think that she would decompensate and would struggle.

So maybe it wouldn't be so much the activity itself, but it would be the resultant loss of something that's supportive and healing and moves her forward.

AR 114-15.

Dr. Valdez also testified that Plaintiff's impairments would cause her to potentially be absent from work for more than four days per month.  She noted that "certainly up to four times a month, [Plaintiff] gets triggered and that would – that results in impairment.  That results in [Plaintiff getting] incredibly fearful about leaving the house."  AR 111.

### 2.    Fauzia Shujaat, M.D.

Dr. Fauzia Shujaat[4] treated Plaintiff through medication management and therapy from April 23, 2012 to January 29, 2013 on a monthly or bi-weekly basis.  AR 843, 899, 1219.  Dr. Shujaat completed a mental impairment questionnaire on July 5, 2012.  AR 609.  She stated that Plaintiff "endorses symptoms of depression, including anhedonia, difficulty sleeping, difficulty concentrating, low energy, intermittent suicidal ideation; has had three suicide attempts in the past; and has PTSD with intermittent nightmares and hypervigilance."  AR 601.

Dr. Shujaat stated that Plaintiff is unable to meet competitive standards or is seriously limited but not precluded in several areas for unskilled and skilled work.  AR 603-04.  She concluded that Plaintiff has difficulty concentrating at work; is distractible due to depressive symptoms; decompensates under stressful situations; and has nightmares, chronic suicidal ideation, hypervigilance, and anxiety due to PTSD.  AR 603.  Dr. Shujaat opined that Plaintiff had unlimited or very good ability to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  AR 604.  She also stated that Plaintiff had limited but satisfactory ability to interact appropriately with the general public, travel in unfamiliar place and

---

[4] Both parties and the ALJ spell Dr. Fauzia Shujaat's last name as "Shutaat."  From the record, "Shujaat" appears to be the correct spelling.   The ALJ also erroneously refers to Dr. Shujaat using the pronoun "he."

1  use public transportation.  AR 604.

2      Dr. Shujaat found Plaintiff to have marked restriction of activities of daily living; marked

3  difficulties in maintaining social functioning; marked difficulties in maintaining concentration,

4  persistence, or pace; and one or two episodes of decompensation within a twelve month period,

5  each of at least two weeks duration.  AR 605.

6  ### 3.      Brooke Otterson, Psy.D. Candidate and Therapist-in-Training

7      Therapist-in-training Brooke Otterson provided individual therapy to Plaintiff from August

8  15, 2010 to January 13, 2011.  AR 592.  Otterson diagnosed Plaintiff with chronic PTSD due to

9  her reported and observed symptoms.  AR 593.  When Plaintiff began individual therapy with

10  Otterson, she reported experiencing several symptoms on a chronic basis: intrusive flashbacks of

11  sexual traumas that triggered feelings of fear, anxiety, dissociation and helplessness; feelings of

12  anger directed at her attackers that resulted in persistent irritability and a tendency to anger easily;

13  insomnia; fatigue; difficulty concentrating; difficulty working; difficulty in relationships around

14  issues of trust; boundaries, and intimacy; and hypervigilance.  AR 592.

15      Otterson's prognosis was that Plaintiff would "need the continued support of therapy due

16  to the frequent and intrusive nature of PTSD symptoms."  AR 593.  Plaintiff's progress in therapy

17  was "marked by slow but steady gains and integration of therapeutic tools, accompanied by

18  periods of 'setbacks' characterized by increased cognitive disorganization."  AR 593.

19  ### 4.      Department of Veteran Affairs Rating Verification

20      On July 12, 2011, the Department of Veteran Affairs ("VA") issued a decision granting

21  Plaintiff service-connected disability for PTSD with an evaluation of 100 percent, effective

22  February 17, 2010.  AR 305.  This decision was reached based on a VA examination dated

23  September 16, 2010 and treatment records from 1982 to 1989 and from 2009 to 2011.  AR 305-06.

24  An evaluation of 100 percent is assigned "whenever there is evidence of total occupational and

25  social impairment, dues to such symptoms as: gross impairment in thought processes or

26  communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent

27  danger of hurting self or others; intermittent inability to perform activities of daily living

28  (including maintenance of minimal personal hygiene); disorientation to time or place; memory

loss from names and close relatives, own occupation, or own name." AR 307.  The VA granted an evaluation of 100 percent because the VA examination showed Plaintiff's "symptoms more closely approximate total occupational and social impairment due to [Plaintiff's] persistent danger of harming [herself] and dissociation."  AR 307.

### 5.    Nadine J. Kravatz, Psy.D.

On May 3, 2012, Dr. Nadine J. Kravatz, a consultant for the agency, reviewed Plaintiff's medical records, but did not examine Plaintiff.  AR 138-48.  Dr. Kravatz opined that Plaintiff sustains moderate or insignificant concentration and persistence limitations.  AR 144-145.  Dr. Kravatz also opined that Plaintiff is moderately or insignificantly limited in her social interactions.  AR 145.

### 6.    Karla Kerlikowske, M.D.

Dr. Karla Kerlikowske has treated Plaintiff since April 2, 2012.  AR 611.  Dr. Kerlikowske completed a physical RFC questionnaire on July 19, 2012.  AR 615.  She opined that, taking into account Plaintiff's impairments, Plaintiff can walk six blocks without rest or severe pain, can sit for more than two hours at one time, and can stand for thirty minutes at one time.  AR 612.  Dr. Kerlikowske also opined that Plaintiff can occasionally lift and carry less than ten pounds.  AR 613.

### 7.    Other Treatment Records

The AR contains voluminous records including progress notes, medications, radiology notes, and lab results from the San Francisco VA Medical Center and US Veterans Center dated from 2009 to 2013.  AR 310-591, 623-1483.

### C.    Vocational Expert's Testimony

Vocational expert ("VE") Robin Scher testified at the hearing before the ALJ on August 27, 2013.  AR 119.  The ALJ asked whether an individual with Plaintiff's age, education and past work experience; ability to sit six hours in an eight-hour day; ability to stand or walk six hours in an eight-hour day; and ability to perform simple, routine, repetitive and unskilled work that requires no contact with the public, occasional contact with co-workers and supervisors, and a lifting maximum of ten pounds could perform any jobs.  AR 120-21.  The VE testified that such

United States District Court
Northern District of California

1    an individual can perform work as a photocopy machine operator, housekeeping cleaner and office

2    helper.  AR 121.

3        The VE conceded that her testimony was not consistent with the Dictionary of

4    Occupational Titles ("DOT"), and testified that some of the housekeeping cleaner jobs would

5    require pushing a cart that might be more than ten pounds and concluded that the number of such

6    jobs available to such an individual should be "eroded" by at least fifty percent.  AR 121.  The VE

7    also testified that the DOT did not specify the lifting requirements for the other two jobs of

8    photocopy machine operator and office helper, but opined that they would not require lifting more

9    than ten pounds based on her twenty-five years of experience as a vocational rehabilitation

10   counselor.  AR 121.

11       The VE also testified that an individual performing such jobs can be off-task up to twenty

12   percent of the workday but cannot be absent more than one day a month on average.  AR 122-23.

13   **IV.    STANDARD OF REVIEW**

14       Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the

15   Commissioner denying a claimant disability benefits.  "This court may set aside the

16   Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal

17   error or are not supported by substantial evidence in the record as a whole."  *Tackett v. Apfel*, 180

18   F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the

19   record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See*

20   *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a mere scintilla, but less than a

21   preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

22   When performing this analysis, the court must "consider the entire record as a whole and may not

23   affirm simply by isolating a specific quantum of supporting evidence."  *Robbins v. Soc. Sec.*

24   *Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

25       If the evidence reasonably could support two conclusions, the court "may not substitute its

26   judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112

27   F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "Finally, the court will not reverse an ALJ's

28   decision for harmless error, which exists when it is clear from the record that the ALJ's error was

1    inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d

2    1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

3    **V.    ISSUES PRESENTED**

4

5        1.   Whether the ALJ erred in weighing the medical opinions;

6        2.   Whether the ALJ erred in weighing the VA disability rating;

7        3.   Whether the ALJ erred in assessing Plaintiff's credibility; and

8        4.   Whether the ALJ erred in the Step Five findings.

9

10   **VI.   DISCUSSION**

11       **A.  The ALJ's Evaluation of the Medical Opinions**

12       Plaintiff argues that the ALJ erred in weighing the medical opinions, specifically in

13   rejecting the opinions of Drs. Valdez and Shujaat.[5]  Pl.'s MSJ at 8-9.

14                **1.    Legal Standard**

15       Courts employ a hierarchy of deference to medical opinions based on the relation of the

16   doctor to the patient.  Namely, courts distinguish between three types of physicians: those who

17   treat the claimant ("treating physicians") and two categories of "nontreating physicians," those

18   who examine but do not treat the claimant ("examining physicians") and those who neither

19   examine nor treat the claimant ("non-examining physicians").  *See Lester v. Chater*, 81 F.3d 821,

20   830 (9th Cir. 1996).  A treating physician's opinion is entitled to more weight than an examining

21   physician's opinion, and an examining physician's opinion is entitled to more weight than a non-

22   examining physician's opinion.  *Id.*

23       The Social Security Act tasks the ALJ with determining credibility of medical testimony

24   and resolving conflicting evidence and ambiguities.  *Reddick*, 157 F.3d at 722.  A treating

25   physician's opinion, while entitled to more weight, is not necessarily conclusive.  *Magallanes v.*

26   *Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted).  To reject the opinion of an

27   ───────────────

28   [5] Although Plaintiff states that the ALJ erred by rejecting Otterson's opinion, she does not discuss
     Otterson's opinion in her motion.  Pl.'s MSJ at 8-11.

United States District Court
Northern District of California

uncontradicted treating physician, an ALJ must provide "clear and convincing reasons." *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188.  If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion.  *Lester*, 81 F.3d at 830.  The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick*, 157 F.3d at 725 (citation omitted).  "[B]road and vague" reasons do not suffice.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  This same standard applies to the rejection of an examining physician's opinion as well.  *Lester*, 81 F.3d at 830-31.  A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).  However, a non-examining physician's opinion may be persuasive when supported by other factors.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant).  An opinion that is more consistent with the record as a whole generally carries more persuasiveness.  *See* 20 C.F.R. § 416.927(c)(4).

### 2.    Analysis

The ALJ gave the "most probative weight to the State agency mental consultant's assessment, which found the claimant capable of performing non-public simple repetitive tasks." AR 49.  The ALJ did not cite the assessment or name the consultant in the decision.   However, upon review of the records in this case, the ALJ appears to refer to Dr. Kravatz, who only reviewed Plaintiff's medical records, but did not examine Plaintiff.  *See* AR 49, 138-48, 141 (no consultative examination required); Def.'s MSJ at 6 (citing AR 138-48); Pl.'s MSJ at 8.

United States District Court
Northern District of California

United States District Court
Northern District of California

a.      **Dr. Valdez**

Plaintiff contends that the ALJ erred by discounting or rejecting Dr. Valdez's opinion. From January 2011 through the date of the hearing, Dr. Valdez was Plaintiff's treating psychologist. AR 108, 311. Dr. Valdez had been treating Plaintiff on a weekly basis, until shortly before the hearing, when she started seeing Plaintiff every two weeks. AR 108. The record indicates over one hundred twenty individual or group therapy sessions during that time period. AR 1484.

As explained above, on September 13, 2012, Dr. Valdez provided a mental impairment questionnaire in which she opined that Plaintiff had marked difficulties in maintaining social functioning and in maintaining concentration, persistence or pace, and that Plaintiff's impairments or treatment would cause her to be absent from work for more than four days per month. AR 621-22. On August 15, 2013, less than two weeks before the hearing, Dr. Valdez completed an updated mental impairment questionnaire that reaffirmed these opinions. AR 1484-89.[6] At the August 27, 2013 hearing before the ALJ, Dr. Valdez explained her opinion that Plaintiff had marked difficulty in maintaining social functioning and maintaining concentration persistence and pace. AR 109-110.

The ALJ did not find that Dr. Valdez's opinion was contradicted by another doctor, and thus her opinion may only be rejected for "clear and convincing" reasons supported by substantial

---

[6] Specifically, in evaluating Plaintiff's mental abilities and aptitudes needed to do unskilled work, Dr. Valdez opined that Plaintiff was "unable to meet competitive standards" in terms of her ability to maintain attention for a two hour segment, maintain regular attendance and be punctual, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and deal with normal work stress. AR 1486. She also opined that Plaintiff was "seriously limited, but not precluded" in her ability to accept instructions and respond appropriately to criticism from supervisors and to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes. AR 1486. Dr. Valdez explained that:

> [Plaintiff] demonstrates significant impairment in ability to concentrate and therefore struggles with remembering, maintaining attention, & punctuality. Further, [Plaintiff's] PTSD results in insomnia & frequent intrusive memories which impair her concentration as well as her ability to manage everyday stresses. She decompensates when stressed. The nature of [Plaintiff's] trauma history also impairs her ability to get along with others, especially when she is triggered.

AR 1486.

evidence.  *See* AR 45-48; *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

The ALJ provides three reasons for discounting Dr. Valdez's opinion: 1) there were inconsistencies in Dr. Valdez's opinion regarding Plaintiff's social functioning; 2) Plaintiff's reported activities reflected in treatment notes appeared to be inconsistent with the identified limitations; and 3) there was a lack of support in the record for the opinion that Plaintiff would be absent more than four days a month.  AR 47-48.  None of these reasons constitute clear and convincing evidence supported by substantial evidence in the record.

First, Dr. Valdez opined that Plaintiff had limitations in social functioning that ranged from limited to serious, but not work preclusive, and also stated that the Plaintiff had "marked" impairment with regard to social functioning.  AR 47.  At the hearing, Dr. Valdez explained that it was "possible for [Plaintiff] to have . . . a positive interaction with the public on . . . a good day," but that she lacked the ability to maintain the positive interaction over time.  AR 113.  Dr. Valdez provided an explanation of how her assessments of Plaintiff were consistent when taking into account the variability of Plaintiff's symptoms.

Second, the ALJ concluded that Plaintiff's participation in various activities contradicted Dr. Valdez's opinion that Plaintiff has marked limitations.  AR 47.  The ALJ opined that the "treatment the [Plaintiff] received has treated her symptoms outstandingly well," and noted that "improvement was acknowledged in February, April, August, September, November and December 2012 as well as March, May and June 2013."  AR 45 (citing AR 470-591, 734-834, 936-1137, 1239-1483).  To reach these conclusions, however, the ALJ selectively cited from the medical records, which as a whole indicate that Plaintiff continued to experience symptoms of PTSD and depression.  In the cited records, Plaintiff discussed sleeping difficulties and triggers for suicidal thought with Dr. Valdez.  AR 1475-76.  Plaintiff experienced increased flashbacks of her abusers and abuse and continued to struggle with intrusive memories.  AR 1456.  Plaintiff sought emergency care due to symptoms of hyperarousal and insomnia.  AR 1387.  During trips to visit family, Plaintiff was triggered by seeing her male cousin and felt unsafe.  AR 1436, 1447.  She also experienced an increase in flashbacks due to interaction over email.  AR 1235.  Plaintiff sometimes struggled interpersonally with one of her group therapy leaders and talked with Dr.

United States District Court
Northern District of California

Valdez about how not to resort to avoidance.  AR 1427.

The ALJ asked Dr. Valdez whether her opinion that Plaintiff had marked impairment in maintaining concentration, persistence and pace was inconsistent with Plaintiff's ability to participate in art shows, organize Take Back the Night, and organize her own treatment.  AR 114. Dr. Valdez explained that these activities took place in the context of a very strong therapeutic setting, "[w]ith an extraordinary amount of resources directed her way."  AR 114.  Under those circumstances, Plaintiff could "do small projects that are meaningful and impactful" was successful in these "mini projects" because they were "consistent with her overall healing and treatment."  AR 115.  Dr. Valdez explained that even in this supportive context, Plaintiff would "often struggle coming and [spent] hours discussing how difficult it was about a particular interaction with a particular person."  AR 114-15.  Dr. Valdez cautioned that projects consistent with Plaintiff's treatment are different from regular and consistent employment and stated that Plaintiff "would decompensate and would struggle" if her time was filled with activities that were not consistent with her treatment.  AR 115.  Activities that are not consistent with overall healing and treatment, such as employment, would lead to a "resultant loss of something that's supportive and healing and moves [Plaintiff] forward."  AR 115.

Furthermore, based on Plaintiff's own testimony about what she actually did for the art shows and the Take Back the Night event, it is not clear that her reported activities are inconsistent with Dr. Valdez's assessment.  Plaintiff testified that for the art shows she "just sen[t] the emails [to artists on a list] and the curator does the rest" and she would "most likely participate by putting [her] art up."  AR 87-88.  For the Take Back the Night event, Plaintiff testified that she sent emails, "did poetry," and attended the candlelight vigil.  AR 90.  From the record it is not at all clear that these activities required the type of concentration, persistence and pace needed to function in employment, or that Plaintiff's participation in them is inconsistent with Dr. Valdez's opinion of Plaintiff's "marked" impairments.

Third, Dr. Valdez explained the basis for her opinion that Plaintiff would potentially be absent from work more than four days per month.  AR 110-11.  She explained that Plaintiff experiences triggers, which can be unpredictable; although Plaintiff could be fine functioning for a

1   couple of days or weeks, if she's triggered "she sort of goes offline." AR 111. She further

2   explained that Plaintiff gets triggered up to four times a month and that results in Plaintiff being

3   "incredibly fearful about leaving the house." AR 111. Dr. Valdez's opinion is consistent with that

4   of Dr. Shujaat, another treatment provider discussed below, (*see* AR 605-06), and is based on Dr.

5   Valdez's regular weekly and biweekly treatment of Plaintiff over a several year period. Based on

6   this record, the ALJ's finding that there is "little in the record to support Ms. Valdez's opinion that

7   the [Plaintiff] would be absent more than four days a month" is not supported by substantial

8   evidence and does not constitute a clear and convincing reason for rejecting Dr. Valdez's opinion.

9   AR 48.

10        In sum, upon review of the record, the court finds that the ALJ did not provide "clear and

11   convincing" reasons supported by substantial evidence to reject Dr. Valdez's opinion.

12        Furthermore, in determining that Dr. Valdez's opinion was not entitled to "controlling

13   weight," the ALJ failed to consider the specified factors to determine the appropriate weight it

14   should be given. 20 C.F.R. § 416.927(c)(2) (if a claimant has a treatment relationship with a

15   provider, and clinical evidence supports that provider's opinion and is consistent with the record,

16   the provider will be given controlling weight.) "If a treating physician's opinion is not given

17   'controlling weight' because it is not 'well-supported' or because it is inconsistent with other

18   substantial evidence in the record, the [SSA] considers specified factors in determining the weight

19   it will be given." *Orn v. Astrue*, 495 F.3d 625, 631 (9th. Cir. 2007). "Those factors include the

20   '[l]ength of the treatment relationship and the frequency of examination' by the treating physician;

21   and the 'nature and extent of the treatment relationship' between the patient and the treating

22   physician." *Id.* (citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii)). Additional factors relevant to

23   evaluating any medical opinion "include the amount of relevant evidence that supports the opinion

24   and the quality of the explanation provided; the consistency of the medical opinion with the record

25   as a whole; the specialty of the physician providing the opinion; and other factors such as the

26   degree of understanding a physician has of the SSA's disability programs and their evidentiary

27   requirements and the degree of his or her familiarity with other information in the case record."

28   *Id.* (citing 20 C.F.R. § 404.1527(d)(3)-(6)) (alterations omitted).

United States District Court
Northern District of California

Even if the treating physician's opinion is not entitled to controlling weight, it is still entitled to deference. *See Orn*, 495 F.3d at 632 (citing SSR 96–2p, 1996 WL 374188, at *4 (July 2, 1996)).[7] "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." SSR 96-2p at *4.

Here, the ALJ failed to go through the required analysis to determine the appropriate weight to give Dr. Valdez's opinion.

### b.    Dr. Shujaat

Dr. Shujaat treated Plaintiff from April 23, 2012 to January 29, 2013, providing medication management and therapy on a monthly or bi-weekly basis.  AR 843, 899, 1219.  On July 5, 2012, Dr. Shujaat completed a mental impairment questionnaire in which she opined that Plaintiff had marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; and that Plaintiff's impairments or treatment would cause her to be absent from work more than four days per month.  AR 605-06.

The ALJ gave Dr. Shujaat's opinion "little weight for the same reasons described above in connection with Ms. Valdez's opinions."  AR 48.  As explained above, the ALJ did not provide clear and convincing reasons supported by substantial evidence in the record for rejecting Dr. Valdez's opinions, nor is her explanation sufficient to discount Dr. Shujaat's treating opinion.

### B.  The ALJ's Weighing of the VA Disability Rating

As explained above, on July 12, 2011, the VA awarded the Plaintiff a 100% service connection disability for her PTSD, effective February 17, 2010.  AR 305.  By letter dated March 26, 2012, the VA confirmed that Plaintiff "was rated 100% permanent and totally disabled effective February 17, 2010."  AR 300.

---

[7] Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, and are to be relied upon as precedents in adjudicating cases.  20 C.F.R. § 402.35(b)(1);  *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009) ("[Social Security Rulings] do not carry the 'force of law,' but they are binding on ALJs nonetheless.").

United States District Court
Northern District of California

### 1.   Legal Standard

Ordinarily, an ALJ must give a VA determination great weight "because of the marked similarity between [the VA and Social Security Administration] disability programs." *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002) (reversing a denial of benefits because the ALJ "failed to consider the VA finding and did not mention it in his opinion").  However, "[b]ecause the VA and SSA criteria for determining disability are not identical," an ALJ may give less weight to a VA determination when she provides "persuasive, specific, valid reasons for doing so that are supported by the record."  *Id.*; *see also Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 695 (9th Cir. 2009).

### 2.   Analysis

Plaintiff argues that the ALJ erred because she did not afford the VA disability determination the proper weight.  The ALJ considered the VA determination and accorded it "little weight."  AR 48.  The ALJ explained that she did so for three reasons: 1) the VA did not specify actual work-related limitations; 2) the VA disability standards differ from the SSA disability standards; and 3) the VA determination did not have the benefit of more recent medical treatment records, which showed an improvement in Plaintiff's mental health.  AR 48.

With regard to the first reason, the VA rating of 100 percent did address occupational limitations and stated that the Plaintiff's symptoms "closely approximate total occupational and social impairment due to [her] persistent danger of harming [herself] and dissociation."  AR 307. The VA determination stated that an evaluation of 100 percent disability is assigned "whenever there is evidence of total occupational and social impairment, dues to such symptoms as: gross impairment in thought processes or communication; persistent delusions or hallucinations; grossly inappropriate behavior; persistent danger of hurting self or others; intermittent inability to perform activities of daily living (including maintenance of minimal personal hygiene); disorientation to time or place; memory loss from names and close relatives, own occupation, or own name."  AR 307.  The VA granted an evaluation of 100 percent disabled after determining that Plaintiff's "symptoms more closely approximate total occupational and social impairment due to [Plaintiff's] persistent danger of harming [herself] and dissociation."  AR 307.

United States District Court
Northern District of California

1    As to the ALJ's second reason, in her decision, the ALJ noted that the Department of

2    Veteran Affairs regulations "include presumptions of disability that are not recognized by the

3    regulations of the Social Security Administration."  AR 48.  The Ninth Circuit has held that an

4    ALJ runs afoul of *McCartey* insofar as she "distinguished the VA's disability rating on the general

5    ground that the VA and SSA disability inquiries are different."  *Valentine*, 574 F.3d at 695.  Thus,

6    the ALJ erred to the extent that she relied on the difference between the VA and SSA disability

7    determinations.  *See Taylor v. Colvin*, No. C 15-01535 WHA, 2016 WL 3971208, at *5 (N.D. Cal.

8    July 25, 2016) (holding that the ALJ erred by according the VA determination "little weight" to

9    the extent that he relied on the differences between the VA and SSA disability determinations;

10   reversing and remanding for the payment of benefits).

11   The ALJ's third reason for giving the VA determination less weight was that additional

12   evidence in the record showed that the Plaintiff had improved, and that the VA did not have those

13   additional records.  AR 48.  The VA's July 12, 2011 decision relied on the following evidence: a

14   September 16, 2010 VA examination, as well as treatment from Haight Ashbury Psychological

15   Services in March 2010, and VA Medical Center treatment reports from September 2009 through

16   June 2011.[8]  AR 203-04.  It is true that the VA's decision did not include subsequent medical

17   records, which do show some improvement.  However, the VA's disability rating is consistent

18   with the record as a whole, and consistent with the medical opinion of Dr. Valdez, Plaintiff's

19   treating psychologist, as well as the medical opinion provided by Dr. Shujaat, who treated Plaintiff

20   after June 2011.  For this reason, the ALJ did not provide persuasive, specific, valid reasons

21   supported by the record for rejecting the VA disability rating.

22   **C.  The ALJ's Assessment of Plaintiff's Credibility**

23   The ALJ found that the Plaintiff's "medically determinable impairments could reasonably

24   be expected to cause the alleged symptoms; however, the [Plaintiff's] statements concerning the

25   intensity, persistence and limiting effects of these symptoms are not entirely credible."  AR 44.

26

27   [8] The VA also relied on Plaintiff's service treatment records from 1982-1989, Veteran's Claims for Assistance Act Letter dated February 23, 2010, DD Form 214, military personnel records from

28   1982-1989, and VA Form 21-526 Veteran's Application for Compensation and/or Pension, received February 17, 2010.  AR 204.

### 1.      Legal Standard

In general, credibility determinations are the province of the ALJ.  "It is the ALJ's role to resolve evidentiary conflicts.  If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld." *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted).  An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989) (citing 42 U.S.C. § 423(d)(5)(A)).  Nevertheless, the ALJ's credibility determinations "must be supported by specific, cogent reasons." *Reddick*, 157 F.3d at 722 (citation omitted).  If an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006).  In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Id*. at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony.").  The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis.  20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted).  First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms.  20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82.  Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted).  Absent affirmative evidence that the claimant is

1    malingering,[9] the ALJ must provide specific "clear and convincing" reasons for rejecting the

2    claimant's testimony.  *Smolen*, 80 F.3d at 1283-84.

3              **2.       Analysis**

4              The ALJ noted that Plaintiff's reports of her own activities were "not limited to the extent

5    one would expect, given her complaints of disabling symptoms and limitations."  AR 44.  The

6    ALJ noted that Plaintiff had gone on several vacations since the alleged onset date, engaged in

7    "full and complicated" activities that involved concentration, focus, persistence, pace, and

8    interaction with others, and listed a number of hobbies that "undercut her allegations that [her

9    PTSD] symptoms have been disabling for a continuous 12-month period."  AR 44-45.

10             The ALJ found that Plaintiff's decision to go on vacations tended to suggest that the

11   "alleged symptoms and limitations may have been somewhat overstated."  AR 44.  The ALJ noted

12   that Plaintiff testified that when she went on vacation she had problems due to her PTSD and

13   mostly stayed in her room, but that the treatment record from November 2011 noted that Plaintiff

14   had a "good time" in Hawaii, was able to go hiking, and that her only difficulty was vertigo after

15   being in a submarine.  AR 44, 462, 464, 469.  The ALJ also noted that Plaintiff told a treatment

16   provider that she did a lot of walking while in Chicago, which conflicted with Plaintiff's testimony

17   that she mostly stayed in her room while on vacation.  AR 44.

18             The ALJ also detailed Plaintiff's activities, which she found were "full and complicated"

19   and involved "working closely with others," the ability to bring tasks to completion, and "juggling

20   multiple priorities."  AR 44, 47.  The ALJ pointed out that Plaintiff organized five large-scale

21   events/exhibitions in 2012, successfully completed two community arts/activism events in 2013,

22   and was elected Commander of her American Legion post in July 2013.  AR 44.

23             To some extent, the ALJ erred by making broad-brush findings about these activities

24   without accounting for the details that Plaintiff provided in her testimony about how she

25   performed them.   For example, Plaintiff testified that in her role as Commander the American

26   Legion, she met once per month to discuss events, there were about two events per year, and that

27

28   _____
     [9] The ALJ did not conclude that Plaintiff was a malingerer.

United States District Court
Northern District of California

1    she did the "minimum." AR 88-89.  Similarly, Plaintiff testified that for the art shows she "just

2    sen[t] the emails [to artists on a list] and the curator does the rest" and that she would "most likely

3    participate by putting [her] art up." AR 88, 87.  Plaintiff also testified that she had a great deal of

4    help in organizing the art shows, and at the art show in July 2013 she cried for two and a half

5    hours. AR 85-86.  For the Take Back the Night event, Plaintiff testified that she sent emails and

6    "did poetry," and attended the candlelight vigil.  AR 90.  In January 2013, Dr. Shujaat reported

7    that Plaintiff reported increased flashbacks triggered by an interaction over email related to

8    organizing an event. AR 1234-35.  In addition, as discussed above, Dr. Valdez testified that all of

9    these activities took place in the context of a high level of therapeutic support.  The ALJ does not

10   acknowledge that context.

11         Recognizing that "disability claimants should not be penalized for attempting to lead

12   normal lives in the face of their limitations," the Ninth Circuit has held "[o]nly if [her] level of

13   activity were inconsistent with [a claimant's] claimed limitations would these activities have any

14   bearing on [her] credibility." *Garrison v. Colvin*, 759 F.3d 995, 1016 (9th Cir. 2014) (quoting

15   *Reddick*, 157 F.3d at 722).  Accordingly, the supposed inconsistencies between Plaintiff's claimed

16   limitations and her activities related to her involvement with the art shows, the American Legion,

17   and the Take Back the Night event, all of which took place with a high level of therapeutic

18   support, do not satisfy the requirement of a clear, convincing, and specific reason to discredit

19   Plaintiff's testimony regarding her impairments.

20         However, the ALJ correctly identified some inconsistencies in Plaintiff's testimony about

21   her activities and abilities related to travel.  For example, at the hearing, Plaintiff testified that

22   when she went to Chicago "for the most part, I stayed in my room;" however, her recreational

23   therapy note from September 7, 2011 states that Plaintiff called from Chicago and "stated that she

24   did 'a lot' of walking." AR 84, 376.   With regard to the Hawaii trip, Plaintiff testified that she

25   "did not exactly have fun" because she got sick and that "for the most part, I stayed in my room,

26   except for maybe I went to one show." AR 84.  However, a treatment note from November 8,

27   2011 states that Plaintiff had a "good time" on her Hawaii trip, but became dizzy when she was in

28   a submarine. AR 353, 468-69.  The record contains evidence that Plaintiff's testimony at the

United States District Court
Northern District of California

1    hearing about her activities on her trips is somewhat inconsistent with treatment notes describing

2    activities closer in time to the trips.

3         In conclusion, some but not all of the ALJ's analysis constituted clear and convincing

4    reasons for not fully crediting Plaintiff's statements.

5    **D.    Whether the ALJ's Step Five Findings Erred**

6         Plaintiff also contends that the ALJ erred in her Step Five findings because she failed to

7    identify and resolve conflicts between the VE's testimony and the DOT.  Pl.'s MSJ at 13-15.

8         Because the court has found that the ALJ erred in weighing the medical opinions of Drs.

9    Valdez and Shujaat and the disability determination of the VA and in assessing the Plaintiff's

10   credibility, the court need not reach the issue of whether the ALJ erred in her Step Five findings.

11   **E.  Remand**

12        The court finds that the ALJ committed legal error in according little weight to Drs. Valdez

13   and Shujaat.  The court also finds that the ALJ committed legal error in according little weight to

14   the VA disability determination.  Finally, the court finds that some but not all of the analysis

15   provided by the ALJ amounted to clear and convincing reasons for finding Plaintiff not fully

16   credible.

17        A court may remand a disability case for further proceedings "if enhancement of the record

18   would be useful." *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).  It may only remand

19   for benefits, on the other hand, "where the record has been fully developed and further

20   administrative proceedings would serve no useful purpose."  *Id.*  In determining whether to

21   remand for benefits, the Ninth Circuit has devised a "three-part credit-as-true standard."  *Garrison*,

22   759 F.3d at 1020.  Each part of the standard must be satisfied in order for a court to remand to an

23   ALJ with instructions to calculate and award benefits:

24        (1) the record has been fully developed and further administrative proceedings
          would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient
25        reasons for rejecting evidence, whether claimant testimony or medical opinion; and
          (3) if the improperly discredited evidence were credited as true, the ALJ would be
26        required to find the claimant disabled on remand.

27   *Id.*  A court is required to remand for further development of a disability case when, "even though

28   all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates

United States District Court
Northern District of California

serious doubt that a claimant is, in fact, disabled." *Id.* at 1021.

In this case, further administrative proceedings would be helpful in determining Plaintiff's functional capacity and the limitations of her impairments. For the reasons set forth in this order, the court finds that the record would benefit from further development.

## VII.   CONCLUSION

For the foregoing reasons, the court remands this case for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: September 15, 2016

_____
Donna M. Ryu
United States Magistrate Judge

United States District Court
Northern District of California